# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

In the Matter of the Search of:

the Facebook Account of Levita Brewer, Facebook ID Number 10000762243419, User Name of "vita newtoou brewer"

)
)
)
)
)
)

Case No. 17-879 M

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

■ evidence of a crime;
■ contraband, fruits of crime, or other items illegally possessed;
■ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 18 U.S.C. 844(i)

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Rick Hankins, ATF
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: April 26, 2017

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin     Honorable Nancy Joseph     U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR SEARCH WARRANTS

I, Rick Hankins, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user IDs.

2.    I am a Special Agent of the United States Justice Department, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), currently assigned to the Milwaukee Field Office. I have been so employed since April 2003. My duties as a Special Agent with ATF include investigating alleged violations of the federal firearms, explosives, and arson statutes.

3.    I have completed approximately 26 weeks of training at the Federal Law Enforcement Training Center (Glynco, Georgia), as well as the ATF National Academy. That training included various legal courses related to Constitutional Law as well as search and seizure authority. Additionally, I have received training on how to conduct various tasks associated with criminal investigations, such as: interviewing, surveillance, and evidence collection.

4.    In addition to my duties as a criminal investigator, I am also an ATF Certified Fire Investigator (CFI). As an ATF CFI, I am tasked with providing expert opinions as to the

origin and cause of fires. I obtained the ATF CFI certification in 2009 following a two-year training program that centered on various fire science topics including, but not limited to: chemistry, fire dynamics, and building construction. The two-year ATF CFI certification program consisted of college courses, written exams, research papers, reading assignments, practical training exercises, and test burns of various materials. I am re-certified annually as an ATF CFI. To date, I have participated in over 230 fire scene examinations and have testified as an expert. Additionally, I have been certified as a fire investigator by the International Association of Arson Investigators since June 2011. I have received over 1,000 class hours of fire related training. Furthermore, I have been an instructor regarding fire related topics on 38 occasions for the following agencies and institutions: The National Fire Academy (FEMA), International Association of Arson Investigators Chapter 25, Waukesha County Technical College, and Blackhawk Technical College. I have also participated in over 185 live fire training exercises, where I started training fires and observed fire growth and development. Finally, I was a full-time instructor at the ATF National Academy from August 2015 – August 2016, where I taught several topics during Special Agent Basic Training for new ATF recruits. Specifically, I was a primary instructor for the arson block of training at the ATF Academy.

5. During the course of my career, I have had trainings regarding the use of social media in relation to criminal investigations. Specifically, I have received instruction regarding the use of social media sites by criminal elements. Additionally, I have conducted previous criminal investigations in which internet research that I conducted yielded the use of social media by suspects. Specifically, I know from my training and experience that alleged suspects of criminal activity, who have accounts on social media websites, will often communicate their criminal intentions or past activity via "instant message" or "in-box message" on a given social

2

media website. The "instant message" / "in-box message" is a private communication from one user to another. Furthermore, I know through experience that many social media users often use social media websites as their primary means to communicate with others. Additionally, I know from training and experience that suspects who use social media websites sometimes post photographs of themselves possessing incriminating items, such as large amounts of cash, narcotics and firearms. Also, suspects in criminal investigations have been known to post statements on social websites referencing their own criminal activity.

6.      I have previously applied for and received search warrants related to the crime of arson, as well as other crimes.

7.      Information contained in this affidavit was either obtained directly by me or by other investigators who I believe to be truthful and credible. The facts in this affidavit come from personal observations, training and experience, and information obtained from other investigators and witnesses.

8.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Levita Brewer (B/F DOB: 7/23/1983) has in her possession evidence of crimes committed in violation of Title 18 U.S.C. 844(i) (malicious use of fire). There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## IDENTIFICATION OF ITEMS TO BE SEARCHED

10.     This affidavit seeks authorization to obtain records associated with the following Facebook accounts:

3

| NAME | FACEBOOK IDENTIFICATION (UID) | FACEBOOK USERNAME |
|------|-------------------------------|-------------------|
| Levita Brewer | 100007622434191 | vita newtoou brewer |
| Mikiala Fountain | 100000278429481 | mickypennhouse suite |

11. The applied-for warrant would authorize the search and recovery of evidence particularly described in Attachment B.

## PROBABLE CAUSE

Fire Scene Investigation at 1902 West Brown Street, Milwaukee, Wisconsin

12. On December 1, 2014, just before 11:00 p.m., fire damaged a 6-unit apartment building located at 1902 West Brown Street in Milwaukee, Wisconsin. The Milwaukee Fire Department responded and extinguished the fire. · The Milwaukee Police Department did not dispatch a certified fire investigator at that time.

13. According to firefighter accounts, there was a "rubbish" fire located in the main foyer of 1902 West Brown Street that was quickly extinguished by firefighters. Additionally, firefighters reported that they observed fire through exterior windows for Unit #1. Firefighters found the apartment door for Unit #1 locked, so they forced open that door and subsequently extinguished two separate fires inside Unit #1.

14. After the examination of the fire scene and reviewing witnesses' statements and photographs, I determined that there were three separate and unrelated fire origins inside 1902 West Brown Street. Specifically, there was one fire origin in the first floor south common foyer, near the tenant mailboxes. Additionally, there were two separate fire origins inside Unit #1. The three separate fires appear to have been the result of open flame ignition of available light combustible material. The fires were classified as incendiary, an intentional act.

4

Fire Scene Investigation at 4320 West Eggert Place, Milwaukee, Wisconsin

15.     The next day, December 2, 2014, fire damaged an 8-unit apartment building located at 4320 West Eggert Place in Milwaukee, Wisconsin. Three occupants and three firefighters were hospitalized as a result of this fire. The fire was discovered and reporied by the renter of unit #8, L.E., who arrived home to her apartment building at approximately 10:05 p.m. and observed a fire in the first floor common hallway. L.E. stated the fire initially spanned only along the west wall of the common hallway and quickly grew. The fire ultimately blocked safe egress for the building's occupants, who had to then escape out of the windows.

16.     Three firefighters sustained injuries during search and rescue efforts at 4320 West Eggert Place. Firefighter B.B. suffered a laceration above his right and bruising to that eye. Additionally, Firefighter B.B. also suffered burns to both ears, both sides of his head, right wrist, lower back, and right calf. Firefighter D.H. suffered burns to his right and left calves, both ears, right hand, and fingers. Firefighter D.H. also suffered a broken wrist. Captain B.M. suffered burns to his right arm, right calf, face, both ears, left shoulder, and right wrist.

17.     The Milwaukee Police and Fire Departments, along with Deputy State Fire Marshals, conducted a fire scene examination on December 3, 2014. ATF Accelerant Detection Canine Yuma was deployed into the fire scene and alerted to multiple areas along the west wall in the first floor common hallway. Investigators collected samples of fire debris and building material from the canine alert areas and submitted those samples to the Wisconsin State Crime Laboratory. The Wisconsin State Crime Laboratory subsequently reported that gasoline was found in those collected samples. The Wisconsin State Fire Marshal's Office classified the fire at 4320 West Eggert Place as incendiary, an intentional act.

5

Property Management Company / Building Owner Interviews

18.     The victim apartment buildings at 1902 West Brown Street and 4320 West Eggert Place are both owned by B.M. and managed by B.M.'s property management company AASAP.

19.     According to employees and records at AASAP, Levita Brewer (a.k.a. Levita Campbell) and her husband, Stepfonz Campbell, used to live in Unit #1 at 1902 West Brown Street until they were evicted in August 2014. The eviction was court ordered due to non-payment of rent.

20.     B.M. and employees at AASAP reported that the eviction of Levita Brewer and Stepfonz Campbell was hostile. Specifically, Stepfonz Campbell allegedly threatened an employee at AASAP who was part of the eviction process.

21.     Investigators further learned from B.M. and employees at AASAP that Stepfonz Campbell's mother, Michelle Campbell, lived in Unit #4 at 4320 West Eggert Place until her eviction in August 2014. Additionally, another son of Michelle Campbell, Walter Fulton, lived in Unit #3 at 4320 West Eggert Place until his eviction in August 2014. Michelle Campbell and Walter Fulton were evicted for non-payment of rent.

22.     According to AASAP employees, Stepfonz Campbell and Levita Brewer moved from 1902 West Brown Street to 4320 West Eggert Place after their eviction and stayed in Michelle Campbell's vacated apartment (Unit #4) until AASAP management learned they were living there and told them to leave.

23.     ATF agents later interviewed Michelle Campbell and she confirmed that she had animosity toward B.M.

6

Surveillance Video of Van Leaving Area of 4320 West Eggert Place

24. Investigators located surveillance video footage from a school located directly across the street from 4320 Eggert Place. Specifically, the footage shows a minivan leaving the area of 4320 West Eggert Place at approximately 10:05 p.m. on December 2, 2014, about the same time the fire was discovered. The minivan fleeing the area appears to have come from near 4320 West Eggert Place because it was not seen in other camera angles.

25. The video image of the suspect minivan was not close enough to identify a license plate but was clear enough to determine the body style and general coloring of the vehicle. Most notably, the van showed a two-tone coloring with a dark color on the upper approximate ¾ of the van and a lighter color on the bottom approximate ¼ of the vehicle.

Mercury Van Registered to Levita Brewer

26. Stepfonz Campbell was arrested on January 29, 2015, in Jackson, Tennessee on a probation warrant. At the time of his arrest, Stepfonz Campbell was traveling in a Mercury Villager minivan. ATF agents subsequently interviewed Stepfonz Campbell and he confirmed that his vehicle was an old Mercury minivan.

27. ATF agents also interviewed Levita Brewer in Jackson, Tennessee. Outside Levita Brewer's residence, agents observed a Mercury Villager minivan, bearing TN plate # T15-87V, and registered to Levita Brewer. Brewer's Mercury minivan was two-toned with dark blue on the upper approximate ¾ of the vehicle and gray on the approximate bottom ¼ of the van. Agents photographed the Mercury minivan.

28. Investigators compared the photos of Brewer's Mercury minivan to the images of the suspect van seen leaving the area of 4320 West Eggert Place on December 2, 2014. The two vehicles appear identical in body style and coloring.

7

29. ATF agents conducted a Mirandized recorded interview of Stepfonz Campbell on March 25, 2015 at the Milwaukee Secure Detention Facility. During that interview, I showed Campbell a still frame image of the suspect van leaving the area of 4320 Eggert Place at the time of the fire on December 2, 2014. When I asked Campbell if the van in the photo looked like his Mercury van, Campbell was adamant that it did not. Campbell further said that his Mercury van had a completely different body style and coloring. Campbell stated his van was not two-tone colored, but instead a solid blue color.

30. Later that evening, during a recorded jail call with his sister, Campbell stated that he had just been interviewed by ATF about the fire that damaged 4320 West Eggert Place. Campbell told his sister that investigators had shown him some photographs that looked like his van.

Electronic Surveillance Records

31. During the interview on March 25, 2015, Stepfonz Campbell stated his cell phone number was (414) 745-3978 and that he has had that cell phone number for approximately one year. Additionally, Campbell confirmed the cellphone number for Levita Brewer in the same interview – (414) 326-7023.

32. Cell site records for these phone numbers show that Stepfonz Campbell placed an outgoing cell phone call on December 1, 2014, at 10:48 p.m. utilizing the cell tower nearest to 1902 West Brown Street in Milwaukee, Wisconsin. The fire at 1902 West Brown Street was reported at approximately 10:52 p.m.

33. Cell site records for these phone numbers further showed that Stepfonz Campbell called Levita Brewer on December 2, 2014, at 10:05 p.m., while both of their cell phones utilized

8

the cell tower nearest to 4320 West Eggert Place in Milwaukee, Wisconsin. The phone call took place at approximately the same time the fire was being discovered at 4320 West Eggert Place.

Stepfonz Campbell's Second Custodial Statement

34.    On October 3, 2016, I conducted a second recorded, Mirandized interview of Stepfonz Campbell at the Kettle Moraine Correctional Institution located in Plymouth, Wisconsin. During the interview, Campbell confessed that he and his wife, Levita Brewer, conspired to set fire to the apartment buildings at 1902 West Brown Street and 4320 West Eggert Place on December 1, 2014, and December 2, 2014, respectively. Campbell said he and Brewer were not trying to hurt anyone and described the landlord as an "asshole."

35.    Campbell stated that he and Brewer went to 1902 West Brown Street on the night of the fire (December 1, 2014) to visit their friend Clarence, who lived in Unit #2. Campbell stated that Clarence opened the backdoor for them when they arrived to visit him. After they visited Clarence for no more than 10 minutes, Campbell said he and Brewer left Clarence's apartment and walked by the door to Unit #1. Campbell said Unit #1 was unlocked so they walked in.

36.    Campbell said he and Brewer walked around Unit #1 to see what was inside the apartment. Campbell said Brewer used her lighter to set fire to the carpet in the living room. Campbell then added that Brewer had found some newspaper inside Unit #1 and stuffed it under the edge of the carpet and set fire to the newspaper near the front bedroom. Campbell said there were two separate fires set inside Unit #1. Campbell could not recall if they locked Unit #1 when they left. Campbell said he and Brewer walked to the front door of the apartment building and Brewer set fire to a newspaper bin near the front door.

9

37.     Campbell said that the night after setting fire at 1902 West Brown Street, he and Brewer ran out of gas in the minivan. Campbell said that after they put gas in their van there was still a small amount of gasoline in their gas can. Campbell stated that they ended up at 4320 West Eggert Place. He pulled the minivan behind the apartment and Brewer entered the apartment building through the back door. As he was driving out of the apartment parking lot, Campbell believed someone was coming in so he turned off his van's lights. Campbell said he had to call Brewer on her cellphone to let her know that he had to move the van. Campbell stated he recalled a car parked in front of the apartment on Eggert Place and it looked like someone was being dropped off, because he saw them walk up to the front door as he was waiting for Brewer to come out of the apartment building. Campbell initially said Brewer did not detail exactly what she did inside 4320 West Eggert Place; however, he later reported that Brewer splashed gasoline in the apartment hallway. Campbell said he did not expect the building to burn down "the way it did."

38.     Campbell further clarified that after he dropped off Brewer to set fire to 4320 West Eggert, he left the apartment parking lot and traveled north on Sherman Blvd and did a U-turn before Villard Street, and ended up facing southbound, when Brewer jumped into the van. At that time, Brewer had the gasoline can with her. Campbell stated that when his van was captured on the surveillance video at the intersection that he was driving around the block to pick up Brewer.

39.     Campbell said he did not know 4320 West Eggert Place had burned down "like that" until someone called him to see if his mother was alright. Campbell stated that he later drove by the fire scene and learned that everyone had gotten out of the building.

10

<u>Levita Brewer's Non-Custodial Statement</u>

40. On December 18, 2016, ATF and DCI agents conducted a recorded, non-custodial interview of Levita Brewer at her residence in Jackson, Tennessee. Brewer confirmed that she and Stepfonz Campbell previously lived at 1902 West Brown Street and 4320 West Eggert Place. Brewer claimed she did not participate in or have knowledge of the two fires at 1902 West Brown Street and 4320 West Eggert Place, but subsequently admitted to being present at both locations on the nights of the fires.

41. Brewer stated that on the night of the 1902 West Brown Street firer, she and Campbell visited a man named Clarence at 1902 West Brown Street. Brewer stated that she was intoxicated on that night. Brewer later admitted that she and Campbell visited Clarence so that Campbell could try to intimidate Clarence into giving them money. Brewer further said that Campbell used to sell marijuana and prescription pills to Clarence and that Campbell routinely committed both armed and strong-arm robberies. Brewer stated that she and Campbell were visiting the Milwaukee area from Tennessee for approximately one week in November-December 2014, and that Campbell spent that time in Milwaukee looking for robbery victims so that they would return to Tennessee with money for Christmas.

42. While at Clarence's apartment, Brewer reported that at one point, Campbell left Clarence's apartment for 10-15 minutes. She claimed Campbell went upstairs to visit another old neighbor. Brewer denied entering their old apartment, Unit #1. Brewer did recall seeing a stack of newspapers and fliers under the tenant mailboxes in the common foyer. Brewer said she and Campbell walked out of 1902 West Brown Street through the front door and at no point did she observe any fires.

11

43. When asked about the fire at 4320 West Eggert Place, Brewer stated that she and Campbell cased 4320 West Eggert Place for a robbery on the night of the fire. Specifically, Brewer said she drove their van behind the apartment building so that Campbell could see whose car was parked in the apartment's parking lot. Brewer further said that she later parked down the street from the apartment building and Campbell exited the van with a McDonald's cup. Brewer said that she saw Campbell place his small, silver pistol inside the cup before exiting the van. Brewer denied seeing Campbell take any ignitable liquid with him. Brewer stated that Campbell cut behind and between houses in order to get to the back door of 4320 West Eggert Place. Brewer said that Campbell subsequently called her and told her to "hurry" and pick him up on Sherman Boulevard near 4320 West Eggert Place. Brewer said she did not know that Campbell had just set a fire to 4320 West Eggert Place until she learned of the fire the next day. Brewer said that Campbell's mother received calls regarding the 4320 West Eggert Place fire and Brewer "put two and two together" to determine that Campbell must have set the fire.

Interview of Mikiala Fountain

44. On April 17, 2017, I interviewed Mikiala Fountain. Fountain said Brewer confessed to Fountain that Brewer had set the fire at 4320 West Eggert Place 1-2 days after the fire. Fountain said Brewer told her about setting the fire while Brewer and Stepfonz Campbell were staying with Fountain in December 2014, and before they traveled back to Tennessee. Fountain said she looked up the fire after Brewer confessed to setting the fire. Fountain stated Brewer claimed she set the apartment on fire because the owner was a "slumlord" who never fixed his buildings. Fountain also said Brewer told her that Brewer warned the apartment building occupants by yelling "fire" after she set the fire inside the building.

12

45.     When asked why Brewer would have confessed her crimes to Fountain, Fountain said she and Brewer were like sisters at the time and they shared a lot of intimate information.

46.     Fountain further stated that Brewer had sent her subtle admissions regarding the fire via Facebook. Fountain said Brewer sent Facebook instant messages to Fountain's Facebook account with username "MickeyPennhouse Suite." Fountain does not use that username anymore and Facebook locked the account because Fountain lost her email password and could not verify her identity, so she has since created a new Facebook account. Fountain also stated that Brewer had a Facebook username of "vita newtoou brewer." I later observed publicly available profile photographs on the "vita newtoou brewer" Facebook account and recognized the photographs as Levita Brewer, who I have personally interviewed.

47.     Your affiant believes additional information relevant to the arsons will be located within the above-described Facebook accounts. Additional relevant information includes pictures, text, and geographic information that will assist in further investigation of the arson suspects.

Facebook Information

48.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

49.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook

13

security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

50. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

51. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

52. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In

14

addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

53.    Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

54.    Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

55.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

56.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

57.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

58.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

59.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

60.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

61.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

62.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a

16

Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

63. Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

64. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

65. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

17

66.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

67.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and

18

geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

68.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

69.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

19

# **ATTACHMENT A**

*Property to Be Searched*

To the extent that the information described in Attachment B is within the possession, custody, or control of Facebook, Facebook is required to disclose to the government the information, for the dates of December 1, 2014, to present, for the following accounts:

| NAME | FACEBOOK IDENTIFICATION (UID) | FACEBOOK USERNAME |
|---|---|---|
| Levita Brewer | 100007622434191 | vita newtoou brewer |
| Mikiala Fountain | 100000278429481 | mickypennhouse suite |

20

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

a.      All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

b.      All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

c.      All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

d.      All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments;

gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e.      All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

f.      All "check ins" and other location information;

g.      All IP logs, including all records of the IP addresses that logged into the account;

h.      All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

i.      All information about the Facebook pages that the account is or was a "fan" of;

j.      All past and present lists of friends created by the account;

k.      All records of Facebook searches performed by the account;

l.      All information about the user's access and use of Facebook Marketplace;

m.      The types of service utilized by the user;

n.      The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

o.      All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

p.      All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

2

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18 U.S.C. 844(i) (arson of property in interstate commerce), since December 1, 2014 for each user ID identified on Attachment A, information pertaining to the following matters:

(a) The relevant offense conduct, any preparatory steps taken in furtherance of the scheme, communications between Fountain and others related to the relevant offense conduct of commercial arson.

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(e) The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of commercial arson.

3

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS
## RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the

laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information

contained in this declaration is true and correct. I am employed by Facebook, and my official

title is _____. I am a custodian of records for Facebook. I state

that each of the records attached hereto is the original record or a true duplicate of the original

record in the custody of Facebook, and that I am the custodian of the attached records consisting

of _____ (pages/CDs/kilobytes). I further state that:

a.     all records attached to this certificate were made at or near the time of the occurrence of

the matter set forth, by, or from information transmitted by, a person with knowledge of those

matters;

b.     such records were kept in the ordinary course of a regularly conducted business activity

of Facebook; and

c.     such records were made by Facebook as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal

Rules of Evidence.


_____      _____

Date                                  Signature